UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

301-375 WEST ONONDAGA STREET, LLC,

         Plaintiff,

v.                   5:18-CV-1044
                   (TWD)

LIBERTY MUTUAL FIRE INSURANCE COMPANY,
LIBERTY MUTUAL INSURANCE COMPANY, OHIO
SECURITY INSURANCE COMPANY,

         Defendants.
_____

APPEARANCES:            OF COUNSEL

LYNN LAW FIRM, LLP         MARTIN A. LYNN, ESQ.
*Attorneys for Plaintiff*          PATRICIA A. LYNN-FORD, ESQ.
M&T Bank Building
101 South Salina Street, Suite 750
Syracuse, New York 13202

MURA & STORM, PLLC         SCOTT D. STORM, ESQ.
*Attorneys for Defendants*
930 Rand Building
14 Lafayette Square
Buffalo, New York 14203

**THÉRÈSE WILEY DANCKS**, United States Magistrate Judge

## MEMORANDUM-DECISION AND ORDER

   This case involves an insurance coverage dispute regarding an incident at 301-375 West

Onondaga Street, LLC's ("Plaintiff") property that allegedly took place on July 13, 2017.

Currently before the Court is Liberty Mutual Fire Insurance Company, Liberty Mutual Company,

and Ohio Security Insurance Company's (collectively "Defendants") motion for summary

judgment (Dkt. No. 20), and Plaintiff's cross-motion for summary judgment (Dkt. No. 27). For

the reasons that follow, Defendants' motion for summary judgment is granted, Plaintiff's cross-motion for summary judgment is denied, and the Court orders the clerk to enter judgment in favor of Defendants and to close this case.

I. STANDARD OF REVIEW

Summary judgment is appropriate only where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Alexander & Alexander Servs., Inc. v. These Certain Underwriters at Lloyd's, London*, 136 F.3d 82, 86 (2d Cir. 1998).

II. BACKGROUND FACTS

Defendants[1] issued a commercial property policy of insurance (Dkt. No. 20-6, the "Policy") to Plaintiff for the period between May 25, 2017, and May 25, 2018. (Defendants' Statement of Material Facts, Dkt. No. 20-9 at ¶ 1.[2]) Plaintiff submitted a property loss notice to Defendants on July 13, 2017, regarding a water loss event it had suffered that same day. (*Id*. at ¶ 2.) On July 14, 2017, Defendants' property claims specialist inspected the premises with Plaintiff's principal and its public adjuster. (*Id*. at ¶ 3.)

---

[1] Defendants moved for judgment on the pleadings with respect to whether Liberty Mutual Fire Insurance Company and Liberty Mutual Insurance Company are parties of interest. (Dkt. No. 20.) Because the Court ultimately decides Defendants prevail on the merits with respect to the coverage issue, the Court denies Defendants' motion in this respect as moot, and simply refers to Defendants collectively herein.

[2] The Court will cite to Defendants' statement of material facts to the extent the facts cited therein are either admitted or not disputed.

On July 19, 2017, Defendants issued a reservation of rights letter to Plaintiff. (*Id*. at ¶ 7.) Defendants thereafter hired Adam D. Cabral, P.E. ("Cabral") to assist in determining the cause of the loss. (*Id*. at ¶ 8.) Cabral inspected the premises on August 17, 2017, and issued a report to Defendants on August 24, 2017. (*Id*. at ¶ 9 (citing Dkt. No. 20-4).) Based on Cabral's report and its own investigation, Defendants issued a partial coverage denial letter to Plaintiff dated August 30, 2017. (Dkt. No. 20-9 at ¶ 16 (citing Dkt. No. 20-7 at 9-12).) Defendants determined that coverage for the loss was limited to $25,000.00 pursuant to the BP 35 09 11 endorsement of the Policy. (Dkt. No. 20-9 at ¶ 17; *see also* Plaintiff's Statement of Material Facts, Dkt. No. 28 at ¶¶ 40, 41.) Plaintiff thereafter retained Glen L. LeComte, Jr. P.E. ("LeComte") to provide a report regarding the loss. (Dkt. No. 20-9 at ¶ 18 (citing Dkt. No. 20-2 at 31-34).)

### III. DISCUSSION

#### A. Factual Basis for the Loss

Advocacy aside, the parties do not dispute the material details of the incident giving rise to this action. To that end, both experts agree water pooled on the roof and went through a roof drain into a pipe that was clogged at an elbow joint and water subsequently exited through the fitting between the elbow joint and the plastic pipe entering it.[3] Below are excerpts of statements from each parties' respective expert regarding the cause of the loss:

> The subject water intrusion event was the result of the clogged cast-iron roof drain piping backing up, resulting in water seeping out of the improperly connected joints between the original cast-iron piping and the newer plastic piping at the roof drains.

(Dkt. No. 20-4 at 7 (Defendants' expert).)

---

[3] Cabral provided an affidavit wherein he notes he and LeComte generally agree "that the drain failed at the connection between a plastic pipe and a cast iron pipe." (Dkt. No. 20-9 at ¶ 25.) Plaintiff does not dispute the material details of this characterization. (Dkt. No. 28 at ¶ 25.)

3

> It is my opinion that the piping failed at the joint where the plastic
> piping meets the cast-iron piping and caused water to enter the
> building. If a clog had simply stopped drainage, the water would
> have backed up onto the roof and moved through other roof drains,
> ponded or found another infiltration point. A pipe joint failure is
> the likely cause of this water inundation.
> . . .
> It is my opinion that the most likely cause of this water inundation
> is that water could not drain through the cast-iron joint and the pipe
> failed where the plastic piping meets the cast iron joint. This is
> also supported by the video depicting water entry in that location.

(Dkt. No. 20-2 at 33 (Plaintiff's expert).)

In his report, Cabral provided photos of the loss which further support the two complementary opinions. To that end, below is a photo of the clogged cast iron pipe:



(Dkt. No. 20-4 at 14 (cropped and border added).) And, below is a photo showing "a plastic pipe . . . loosely inserted with sealant into the top of the original cast iron pipe" showing "[a] gap between the outside of the plastic pipe and the inside of the cast-iron pipe."



(*Id*. at 15 (cropped and border added).)

The Court thus concludes the material facts of this case are undisputed relative to the event that caused the water intrusion at issue. Specifically, the Court finds the following:

1. Plaintiff had a roof drainage system that collected water into pipes that ran through the interior of Plaintiff's building;

2. At the relevant location, one pipe in the roof drain system that ran from the roof was made of plastic and connected to a cast-iron pipe at an elbow joint;

3. Over time, the elbow joint accumulated debris such that the flow of water was slowed;

4. On July 13, 2017,[4] the drain system clogged at the elbow joint resulting in the water having no means to egress through the pipe;[5]

5. A significant amount of water escaped the pipe system through the connection between the plastic pipe and the cast iron elbow joint.

Given these facts, the Court will now turn to whether Defendants properly provided only partial coverage for the loss described above as provided for in the Policy.

### B. Pertinent Policy Provisions Related to Water Damage

#### i. *Applicable Legal Principles*

The relevant Policy is an all-risk policy. An all-risk policy is one that allows recovery "for all losses arising from any fortuitous cause, unless the policy contains an express provision excluding the loss from coverage." *Parks Real Estate Purchasing Grp. v. St. Paul Fire & Marine Ins. Co.*, 472 F.3d 33, 41 (2d Cir. 2006). Under New York law, an "all-risk insured . . . has the burden of establishing a prima facie case for recovery" by proving three elements: "(1) the existence of an all-risk policy, (2) an insurable interest in the subject of the insurance contract, and (3) the fortuitous loss of the covered property." *Int'l Multifoods Corp. v.*

---

[4] Defendants argue the loss could have resulted from a continuous seepage because their expert described some historic water damage near the roof drain. (Dkt. No. 20-8 at 12-15.) Plaintiff has successfully rebutted Defendants' assertion with a video showing a significant amount of water entering its property on the date of loss. (Dkt. No. 33.) Thus, to the extent Defendants moved for summary judgment with respect to the exclusion regarding continuous seepage, the Court finds there is a dispute as to the material facts. Nevertheless, for the purposes of this motion, the Court accepts Plaintiff's assertion that the loss took place on July 13, 2017.

[5] Defendants opine the exclusions for negligent workmanship or maintenance apply to this loss because the plastic fitting entering the cast iron pipe was improperly sealed. (Dkt. No. 20-8 at 15-170.) Defendants have not established the pipe set-up was negligent or there was an error in maintenance. Rather, there is a material dispute with respect to whether the pipe connection was an appropriate set-up given the nature of the connection. (Dkt. No. 27-3 at ¶ 13, 22.)

*Commercial Union Ins. Co.*, 309 F.3d 76, 83 (2d Cir. 2002). Defendants do not dispute that Plaintiff has established a prima facie case for recovery.

"Once an insured has met its burden of establishing a prima facie case, the burden shifts to the insurer to establish that an exclusion or exception to coverage applies." *Channel Fabrics, Inc. v. Hartford Fire Ins. Co.*, No. 11 Civ. 3483, 2012 WL 3283484, at *6 (S.D.N.Y. Aug. 13, 2012). An exclusion will apply only if it "is stated in clear and unmistakable language, is subject to no other reasonable interpretation, and applies in the particular case." *U.S. Underwriters Ins. Co. v. 101-19 37th Ave. LLC*, 642 F. App'x 10, 11 (2d Cir. 2016) (summary order) (citation omitted). "[I]f the language of the policy is doubtful or uncertain in its meaning, any ambiguity must be resolved in favor of the insured and against the insurer." *Parks Real Estate Purchasing Grp. v. St. Paul Fire & Marine Ins. Co.*, 472 F.3d 33, 42 (2d Cir. 2006) (quoting *Pepsico, Inc. v. Winterthur Int'l Am. Ins. Co.*, 788 N.Y.S. 2d 142, 144 (2d Dep't 2004)).

"Insurance policies are, in essence, creatures of contract, and, accordingly, subject to principles of contract interpretation." *Lantheus Med. Imaging, Inc. v. Zurich Am. Ins. Co.*, 650 F. App'x 70, 71 (2d Cir. 2016) (summary order) (citation omitted). "Under New York law, the interpretation of a contract 'is a matter of law for the court to decide.'" *Id.* (quoting *Int'l Multifoods*, 309 F.3d at 83).

"[W]here the contract's language provides a definite and precise meaning, unattended by danger of misconception in the purport of the contract itself, and concerning which there is no reasonable basis for a difference of opinion," the contract is not ambiguous. *Olin Corp. v. OneBeacon Am. Ins. Co.*, 864 F.3d 130, 148 (2d Cir. 2017) (citation and internal quotation marks omitted). "[I]f a court finds that the contract is not ambiguous it should assign the plain and ordinary meaning to each term and interpret the contract without the aid of extrinsic evidence

and it may then award summary judgment." *Fed. Ins. Co. v. Am. Home Assurance Co.*, 639 F.3d 557, 567 (2d Cir. 2011) (citation omitted).

"Language in an insurance contract will be deemed ambiguous if reasonable minds could differ as to its meaning." *McCarthy v. Am. Int'l Grp., Inc*., 283 F.3d 121, 127 (2d Cir. 2002). "As a general matter, when a contract is ambiguous, its interpretation becomes a question of fact and summary judgment is inappropriate." *Mellon Bank, N.A. v. United Bank Corp*., 31 F.3d 113, 116 (2d Cir. 1994). However, "for the parties' intent to become an issue of fact . . . , there must also exist relevant extrinsic evidence of the parties' actual intent." *Id*. "Ambiguity without the existence of extrinsic evidence of intent presents not an issue of fact, but an issue of law for the court to rule on." *Williams & Sons Erectors, Inc. v. S.C. Steel Corp.*, 983 F.2d 1176, 1184 (2d Cir. 1993).

### ii. *Framing the Relevant Interpretative Question*

The "Exclusions" section begins with what is known as an "anti-concurrent causation" clause that states as follows:

> B. Exclusions
>
> 1. We will not pay for loss or damage caused directly or indirectly by any of the following. Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss. The exclusions apply whether or not the loss event results in widespread damage or affects a substantial area.

(Dkt. No. 20-6 at 35.) This section alerts the insured that, if any of the subsequently listed exclusions apply, Defendants will not cover the loss regardless of whether there might be some other, putatively covered, cause of loss. *See Alamia v. Nationwide Mut. Fire Ins. Co*., 495 F. Supp. 2d 362, 368 (S.D.N.Y. 2007) (citation omitted) (noting "an 'anti-concurrent' clause . . .

8

excludes coverage for damage caused by an excluded peril even when covered perils also contribute to the damage").

The next relevant provision is the exclusion for Water, which provides as follows:

> g. Water
>
>    (1) Flood, surface water, waves, tides, tidal waves, overflow of any body of water, or their spray, all whether driven by wind or not;
>    (2) Mudslide or mudflow;
>    (3) Water that backs up or overflows from a sewer, drain or sump; or
>    (4) Water under the ground surface pressing on, or flowing or seeping through:
>       (a) Foundations, walls, floors or paved surfaces;
>       (b) Basements, whether paved or not; or
>       (c) Doors, windows or other openings.
>
>    But if Water, as described in Paragraphs (1) through (4), results in fire, explosion or sprinkler leakage, we will pay for the loss or damage caused by that fire, explosion, or sprinkler leakage.

(Dkt. No. 20-6 at 36.) As noted, section g.(3) excludes coverage for "[w]ater that backs up or overflows from a sewer, drain or sump[.]" (*Id*. (hereinafter this subsection will be referred to as the "Water Exclusion").) Defendants spend considerable time discussing the applicability of this section. However, Plaintiff purchased an Addendum to the Policy extending coverage for specific causes of loss. Relevant to the dispute here, the addendum includes a section entitled "Water Back-Up And Sump Overflow" that provides as follows:

> G. Water Back-Up And Sump Overflow.
>
>    1. You may extend the insurance provided by this policy to apply to direct physical loss or damage to your property caused by or resulting from:
>
>       a. Water or waterborne material which backs up through or overflows or is otherwise discharged from a sewer or drain; or

9

> b. Water or waterborne material which overflows
> or is discharged from a sump, sump pump or related
> equipment, even if the overflow or discharge results
> from mechanical breakdown of a sump pump or its
> related equipment.
>
> However, with respect to Paragraph (b.) above, we will not
> pay the cost of repairing or replacing a sump pump or its
> related equipment in the event of mechanical breakdown.

(Dkt. No. 20-6 at 86 (hereinafter this subsection will be referred to as the "Water Extension").)

The result is that the Water Exclusion found at Section g. in the Policy and stated above is

"*replaced*" with the following exclusion:

> 4. With respect to the coverage provided under this Extension, the
> Water Exclusion is replaced by the following exclusion:
>
> > (1) Flood, surface water, waves (including tidal wave and
> > tsunami), tides, tidal water, overflow of any body of water,
> > or spray from any of these, all whether or not driven by
> > wind (including storm surge);
> > (2) Mudslide or mudflow; or
> > (3) Water under the ground surface pressing on, or flowing
> > or seeping through:
> > > (a) Foundations, walls, floors or paved surfaces;
> > > (b) Basements, whether paved nor (sic) not; or
> > > (c) Doors, windows or other openings.
> > (4) Waterborne material carried or otherwise moved by
> > any of the water referred to in Paragraph 1. or 3., or
> > material carried or otherwise moved by mudslide or
> > mudflow.
>
> This exclusion applies regardless of whether any of the above in
> Paragraphs 1. through 4. is caused by an act of nature or is
> otherwise caused. An example of a situation to which this
> exclusion applies is the situation where a dam, levee, seawall or
> other boundary or containment system fails in whole or in part, for
> any reason, to contain the water.
>
> But, if Water, as described in (1) through (4), results in fire,
> explosion or sprinkler leakage, we will pay for the loss or damage
> causes (sic) by that fire, explosion or sprinkler leakage.

(*Id*. at 86-87.)  The effect of the addendum, as relevant here, is to specifically <u>add</u> coverage for drain/sewer backup and to eliminate the exclusion for the same found above.  *See Chateau Vill. N. Condo. Ass'n v. Am. Family Mut. Ins. Co.*, 170 F. Supp. 3d 1349, 1356 (D. Colo. 2016) (holding an addendum to the policy does what it says it does, *i.e.*, changes the original policy). In other words, Plaintiff chose to vitiate the original Water Exclusion to *provide* coverage for "[w]ater or waterborne material which backs up through or overflows or is otherwise discharged from a sewer or drain[.]"  (Dkt. No. 20-6 at 86.)

However, coverage under the Water Extension is specifically limited:

> 3.  The most we will pay for the coverage provided under the Water Back-Up And Sump Overflow Extension of coverage is $25,000 per location.

(*Id*.)

Defendants in this case have exhausted the limits provided in the Water Extension.  To that end, Defendants paid Plaintiff $25,000 because they determined the loss was "caused by" or "resulted from" "water or waterborne material which backs up through or overflows or is otherwise discharged from a sewer or drain[.]"  (*Id*.; *see also* Dkt. No. 20-7 at 9-12, 14 (letters denying claim in part and providing for coverage under the BP 35 09 11 endorsement).)

Thus, the Court's interpretative task is to determine whether the undisputed facts of the loss fall within the language in the Water Extension.

### C. The Disputed Interpretations

Though the parties do not address this point, the Court notes the substance of the Water Extension and the Water Exclusion are different.  The table below highlights the differences in each clause:

11

| Water Extension (*provides* coverage for) | Water Exclusion (*excludes* coverage from) |
|---|---|
| Water or waterborne material which backs up through or overflows or is otherwise discharged from a sewer or drain | Water that backs up or overflows from a sewer, drain or sump |

The Water Extension provides coverage for water or "*waterborne material* which *backs up through* . . . or is *otherwise discharged from*" a sewer or drain. Whereas the Water Exclusion eliminates coverage only for "water" and only water "that *backs up or overflows from* a sewer, drain or sump[.]" (*compare* Dkt. No. 20-6 at 36, *with id*. at 86.)

The addition of the "*otherwise discharged from*" language captures a far broader universe of possible ways water may escape a drain to be considered part of the Water Extension—and, thereby subject to the $25,000 coverage limit. Substantively, the difference between "backs up through" and "backs up from" is also significant. For example, the Sixth Circuit Court of Appeals held that the phrase "water that backs up from a sewer," for purposes of a water exclusion in a policy, was not limited to water that backed up into a building or to water that reversed its flow in pipes as would be the case if the language had been "backs up through." *Front Row Theatre, Inc. v. Am. Mfr's. Mut. Ins. Companies*, 18 F.3d 1343, 1348 (6th Cir. 1994)

The impact of the language difference creates a policy paradox. To that end, though the Water Extension—which eliminates the Water Exclusion—was purportedly purchased to *expand* coverage under the Policy, it simultaneously *limits* coverage. Specifically, the Water Extension defines the nature of losses subject to the additional coverage as a *broader* category of potential losses than was originally excluded under the Water Exclusion. In other words, the "addendum" *adds* coverage that was previously excluded but also *limits* coverage given its broader applicability. Without the Water Extension, for example, "waterborne material" that is "otherwise discharged from" a sewer or drain could conceivably be covered to the full extent of

12

the policy. However, with the Water Extension, the same loss becomes subject to a $25,000 limit.

Given this somewhat unique situation, the Court finds the interplay between these two clauses create an ambiguity in the policy. To resolve the ambiguity, the Court will interpret the Water Extension in Plaintiff's favor and construe it to be *no broader* than the original Water Exclusion. Therefore, the Court will interpret the Water Extension to apply *only* to the *exact* same category of losses that were originally excluded in the policy under the Water Exclusion. Thus, the Water Exclusion applies to "water that backs up or overflows from a sewer, drain or sump" and not any of the broader categories of loss that might otherwise have been included in the Water Extension.

Though this distinction is necessary to properly frame the inquiry and favors Plaintiff, it does not answer the ultimate question of whether coverage applies. Rather, the Court must now consider whether: (1) the pipe in question is a "drain" within the meaning of the Water Exclusion; and, if so, (2) did water "back[] up or overflow[] from" that drain? As discussed further below, the Court concludes that the answer to both questions is yes, and, therefore, finds Defendants' decision to provide coverage under the Water Extension—even narrowly construed—was appropriate.

### i. Drain

The definition of the noun "drain" is "a means (such as a pipe) by which usually liquid matter is drained." *Drain*, Merriam-Webster, https://www.merriam-webster.com/dictionary/drain (last visited December 20, 2019). This definition, however, is not altogether helpful because it arguably applies to plumbing systems like a shower drain or sink—a result not even Defendants argue is appropriate. Supplementing the definition is the context the word

"drain" is used in the Policy. To that end, the word "drain" appears alongside the words "sewer" and "sump" in the Policy. "Sewer" means "an artificial usually subterranean conduit to carry off sewage and sometimes surface water (as from rainfall)." *Sewer*, Merriam-Webster, https://www.merriam-webster.com/dictionary/sewer (last visited December 20, 2019). "Sump" means "a pit or reservoir serving as a drain or receptacle for liquids." *Sump*, Merriam-Webster, https://www.merriam-webster.com/dictionary/sump (last visited December 20, 2019). Colloquially, sump and sewer each refer to artificial means to handle surface water and/or sewage.

The common thread between sewer and sump involves the source of the liquids, *i.e.*, each are mechanisms to handle water from an exterior source, *e.g.*, rainfall. Applying the same limitation to the word drain makes interpretive sense. Thus, the Court concludes the term "drain" as used in the Policy refers to a pipe that is used to divert water that comes from an external source, *e.g.*, surface water from rainfall.

Turning to the pipe in question, it was indisputably used to transport rain water that pooled on the roof of Plaintiff's building. Thus, the Court finds the pipe at issue here is a "drain" as contemplated in the Policy.

Plaintiff argues the pipe is not a drain because it was within the internal walls of its building.[6] The Court finds no reason to distinguish between drains that are within the walls of a property and those that are without. In other words, the better way to determine the nature of the relevant pipe is to consider its function not its location. Thus, the natural definition of "drain"

---

[6] Plaintiff's argument with respect to *Pichel v. Dryden Mut. Ins. Co.*, 117 A.D.3d 1267 (3rd Dep't 2014) is unavailing. *Pichel* is no help to Plaintiff because the nature of the pipes involved. Similarly, as Defendants point out, competing policy language in *Pichel* created an ambiguity. There is no such competing language here.

within the meaning of the Policy is a pipe used to carry away external water, *i.e.*, surface water. Such an interpretation ensures coverage would remain for leaks from a clog in pipes in the building's internal plumbing system, *e.g.*, bathrooms or sinks.

### ii. *Back Up or Overflow From*

First, the word "from" is a preposition "used as a function word to indicate a starting point of a physical movement or a starting point in measuring or reckoning or in a statement of limits." *From*, Merriam-Webster, https://www.merriam-webster.com/dictionary/from (last visited Dec. 20, 2019). Thus, the Court holds water that "backs up or overflows *from* a sewer, drain or sump" only refers to water whose starting point, *i.e.*, *source*, is a sewer, drain, or sump. Under this construction, the Policy language "does not include within its meaning water that is unable to enter a drain or sewer (water that is backed up) due to a blockage, but instead only refers to water that, after having entered a drain or sewer, is diverted back up out of it." *Drutz v. Scottsdale Ins. Co.,* No. Civ. WMN-10-3499, 2012 WL 665984, at *5 (D. Md. Feb. 28, 2012); *see also Dent v. Allstate Indem. Co*., 82 Va. Cir. 386 (Va. Cir. Ct. 2011) ("[A]t least some water must enter the drain or pipe for the [exclusion] language to apply.").

The definition of the verb "back up" as it relates to "*water checked by an obstruction*" means "to rise and flow backward or overflow adjacent areas," as in the following sentence: "clogged pipes caused drain water to back up into the house." *Webster's Third International Dictionary* at 160 (2002) (emphasis in the original). Overflow, as a transitive verb, means "to flow over: cover with or as with water: inundate," as in the sentence: "the flooded river overflowed the adjacent fields." *Webster's Third International Dictionary* at 1607 (2002).

Here, the proximate and dominate cause of the loss was a clogged roof drain that allowed water to exit the through a pipe fitting on the drain. In other words, a clog caused water to

"back-up" from the location in the clog and it thereafter "overflowed" "from" the portion of the drain that was not securely sealed and into Plaintiff's property.[7] *See, e.g., Potoff v. Chubb Indem. Ins. Co.*, 874 N.Y.S. 2d 124, 124 (1st Dept. 2009) (finding the cause of loss being a clogged roof drain and holding such a loss relates to "damage caused by water which backs up from within . . . drains"). Accordingly, the Court finds the loss at issue was subject to the Policy endorsement BP 35 09 11 and, therefore, Defendants' coverage position was appropriate.

## IV. CONCLUSION

As recounted above, Defendants paid Plaintiff $25,000.00 pursuant to the Water Extension in the Policy endorsement. Given the discussion above, Defendants are entitled to summary judgment with respect to their coverage decision. Thus, for the reasons stated above, it is hereby

**ORDERED** that Defendants' motion for summary judgment (Dkt. No. 20), is **GRANTED**; and it is further

**ORDERED** that Defendants' motion for judgment on the pleadings (Dkt. No. 20), is **DENIED** as moot; and it is further

**ORDERED** that Plaintiff's cross-motion for summary judgment (Dkt. No. 27), is **DENIED**; and it is further

**ORDERED** that the Clerk enter judgment in Defendants' favor and close this case.

**SO ORDERED.**

Dated: January 6, 2020
       Syracuse, New York

Thérèse Wiley Dancks
United States Magistrate Judge

---

[7] It does not make a difference that the point of egress for the water is the pipe fitting rather than the entry to the drain. Rather, the Policy's language provides it is the means (back up or overflow) and the source (drain)—not the exit location—that triggers or removes coverage.